Filed 2/6/14  In re Elizabeth T. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ELIZABETH T., et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, | F067654 |
| Plaintiff and Respondent, | (Super. Ct. Nos. JD125874, JD125875 & JD128395) |
| v. | |
| C.T., | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from orders of the Superior Court of Kern County.  Louie L. Vega, Judge.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Before Gomes, Acting P.J., Franson, J. and Peña, J.

Theresa A. Goldner, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

These dependency proceedings involve three of C.T.'s five children. C.T. (mother) was denied reunification services as to the children. At the permanency planning hearing (Welf. & Inst. Code, § 366.26),[1] the juvenile court denied mother's petition (§ 388) to either provide her with reunification services or regain custody of her children, and terminated her parental rights pursuant to section 366.26. On appeal, mother challenges the juvenile court's denial of her modification petition, arguing she demonstrated changed circumstances and that she had a bond with the children. We reject these contentions and affirm the juvenile court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2012, the Kern County Department of Human Services (Department) investigated a referral alleging general neglect of mother's then 14-month-old twins, Elizabeth and Emily T., whose father is Christopher M. The family was living together in a two bedroom house in Taft. Mother was pregnant and due the following month; Christopher is not the baby's father.

Both mother and Christopher have other children, all of whom have been juvenile court dependents. In October 2009, dependency jurisdiction was taken over mother's son, then four-month-old E.T., due to her substance abuse. She was given reunification services, which included parenting and counseling for substance abuse, but her services were terminated after six months. In June 2010, she was convicted of two counts of using or being under the influence of controlled substances (Health & Saf. Code § 11550, subdivision (a)). Mother's parental rights were terminated in August 2010, and E.T. was adopted.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

In February 2007, dependency jurisdiction was taken over Christopher's son, I.R., due to I.'s mother's substance abuse. Christopher was given reunification services, which included parenting, substance abuse and child neglect counseling. His services were terminated in August 2007 and his parental rights terminated in June 2008. Christopher has another set of twins with Brandy D. A dependency petition was filed over those twins in September 2011 based on Brandy's substance abuse and failure to protect them, and jurisdiction was taken over them in February 2012. Christopher was denied reunification services at the March 2012 dispositional hearing, although services were ordered for Brandy.

Mother and Christopher also have a history of domestic violence. While investigating a referral received in September 2011, the Department learned that police had been dispatched to the family's home regarding domestic violence. Mother reported that Christopher "head-butted" her during an argument, and fled when she said she would call the police. Christopher was later arrested for driving under the influence. At the time of the Department's investigation, he was incarcerated and would be in jail for at least five months. The Department substantiated a charge of general neglect. In December 2011, Christopher pled no contest to driving under the influence, battery of a spouse or cohabitant, and being under the influence of a controlled substance. He is a registered narcotics offender for methamphetamine; he was required to register in 2009.

In February 2012, as part of the Department's investigation, mother and Christopher voluntarily submitted drug tests that later were confirmed positive for amphetamine and methamphetamine. They began a parenting class that month, and Christopher started attending substance abuse classes. In March 2012, mother told a social worker she had been clean since before she went into rehab while pregnant with the twins and she relapsed after Christopher was released from jail the previous month.

*The Dependency Petitions and Jurisdiction/Disposition Hearing*

3.

On March 23, 2012, the Department filed dependency petitions alleging the twins came within the provisions of section 300, subdivision (b) (failure to protect), based on mother's and father's substance abuse histories, and subdivision (j) (abuse of sibling), based on mother's and Christopher's prior dependency cases. That same day, mother gave birth to a daughter, Hailey M.[2] (The twins and Hailey will be referred to collectively as the children.) On March 26, the twins were ordered detained from their parents. On March 27, mother told the social worker she was starting substance abuse counseling. The following day, the Department filed a dependency petition alleging Hailey came within the provisions of section 300, subdivisions (b) and (j) based on mother's substance abuse history and prior dependency case. The next day, Hailey was detained and ultimately placed into a foster home separate from the twins.

Mother and Christopher refused to drug test for the Department until testing was court ordered. Mother began substance abuse counseling in mid-April. While Christopher was enrolled in substance abuse counseling, he was not attending regularly. He enrolled in domestic violence counseling in March 2012 as required in his criminal domestic violence case, but had already missed a class. On May 7, mother and Christopher were discharged from their substance abuse programs due to lack of attendance.

On May 16, police came to the family's home to serve a search warrant for narcotics. Police had to break down the door to enter the home; inside they found Christopher, mother and another man and woman, as well as a baby who shared the woman's last name. In the house, the officers found, among other things, methamphetamine not far from the baby and a glass methamphetamine smoking pipe. Christopher had methamphetamine and a smoking pipe on his person. An officer

_____

[2] Hailey's alleged father is Christopher R. His whereabouts remained unknown throughout these dependency proceedings.

4.

determined that, while mother appeared to have used drugs recently, she did not seem to be under the influence at that time. Mother told the officer she had last used "meth" approximately four days before when she smoked about $20 worth. Christopher was arrested and charged with possession of a controlled substance for sale, possession of controlled substance paraphernalia, possession of marijuana, being under the influence of a controlled substance, and engaging in a drug transaction within 1000 feet of a school.

On June 25, 2012, mother asked to be put on the drug test hotline. She told a social worker that she had finished her parenting class and was on the waiting list for a substance abuse program. She entered a 45-day inpatient treatment program in Bakersfield on July 18, 2012.

A combined jurisdictional and dispositional hearing was held for the children on August 2, 2012. After the parents submitted on the social worker's reports, the juvenile court found the petitions' allegations true and that the children came within the provisions of section 300, subdivisions (b) and (j). On the Department's recommendation, the juvenile court denied mother and Christopher reunification services pursuant to section 365.1, subdivisions (b)(10), (11) and (13), as both had services and parental rights terminated to the children's half-siblings and failed to make reasonable efforts to treat the problems that led to the half-siblings' removals, and they both had a history of extensive, abusive and chronic drug use and had resisted prior court-ordered treatment. They were given once weekly, two-hour, visits. The juvenile court set a section 366.26 hearing for November 29, 2012.

*The Section 388 Petition*

In a section 388 petition filed on November 27, 2012, mother asked the juvenile court to order reunification services or place the children with her on family maintenance. Mother asserted her circumstances had changed because (1) on August 13, 2012, she had completed 26 days of inpatient substance abuse treatment; (2) she was discharged successfully from that program and transferred to "Jason's Retreat Lincoln Street

'Mommy House'" residential program, where she was still in treatment; (3) she had attended Narcotics Anonymous meetings regularly since July 19, 2012; (4) since her entry into treatment, her drug tests were clean and she continued to be subject to random testing; and (5) she had regularly and consistently visited the children and the visits were of good quality.

Mother stated the requested changes would be better for the children because she had "significantly changed her life and is living clean and sober," she had "disassociated herself from the negative relationship of her past and can now assume a positive rol[e] in her children's lives[,]" and she and the children had an established mother/child relationship which would be further benefited by either services or maintenance.

Attached to the petition were the following documents: (1) a copy of mother's certificate of completion of the parent education class, dated June 21, 2012, and a letter from the program director advising that mother had completed 12 weeks of classes, arrived on time, and participated in discussions; (2) a referral to the inpatient program and verification that she attended the intake appointment; (3) an August 13, 2012 certification of completion of 26 days of residential treatment; (4) verification of her transfer to the Lincoln Street "Mommy House" on August 13, 2012; (5) documentation of her negative drug tests and verification of participation in substance abuse counseling, with an expected completion date of May 1, 2013; (6) copies of sign-in sheets showing mother's attendance at Alcoholics and Narcotics Anonymous meetings; and (7) copies of drug tests mother submitted while in residential treatment.

The juvenile court granted mother a hearing on her petition.

*The Department's Reports*

Both the hearing on the section 388 petition and the section 366.26 hearing were continued a number of times for various reasons; ultimately, they were held together on May 21, 2013. Between November 2012 and May 2013, the Department issued a number of reports on both hearings, which relayed the following pertinent information.

6.

The twins had been living together in a foster home since May 2012. Hailey was living in a separate foster home, where she was placed in April 2012. The children were healthy and developing normally. They were found to be adoptable and their caretakers were committed to adopting them.

Mother and Christopher were receiving court-ordered visits once a week for two hours. Mother had maintained a regular visitation schedule. The social worker reported that while visits were good, the relationship between mother and the children could best be described as a "friendly visitor[,]" and the children looked to their respective caretakers to meet their daily needs and as the primary parental figures in their lives. Between July and November 2012, the twins did not have any contact with Christopher, as he asked to forgo visits during his incarceration. The social worker described his relationship with the twins as that of a "friendly visitor." The social worker opined that termination of parental rights would not be detrimental to the children. The social worker did not believe the children's relationship with mother, and the twins' relationship with Christopher, were significant enough that the children would suffer emotional trauma if parental rights were terminated.

On January 8, 2013, mother, who was pregnant with her fifth child, told a social worker she could remain at the residential substance abuse treatment facility two months after she delivered the baby, which was due in February. Mother did not know where she would live upon leaving the facility, but she planned to move to Bakersfield and was trying to save money to do so. Mother said she had completed substance abuse counseling once before at the same in-patient treatment facility and was able to maintain her sobriety for approximately one year after completing treatment. She identified her environment and friends as triggers to her relapse, which was why she did not want to return to Taft; she needed to change her environment and the people she associated with in order to maintain her sobriety. She believed she would remain sober due to her "45-day stay" in residential treatment.

7.

Mother told the social worker she was not currently in a relationship with Christopher, although she did "communicate" with him, and she did not intend to enter into a relationship with him after her discharge from the program. She was focused on being a good mother, not on her relationship with Christopher, and said they were each doing their "own thing." Even though Christopher was the father of her unborn child, she intended to remain focused on being the mother her children deserved.

Mother gave birth on January 14, 2013; the baby, a girl, was born five weeks early. Mother told a social worker on January 17, 2013, that she could live at the treatment home until April 1, and she planned to stay in Bakersfield. Christopher told the social worker he was in "transitional living," was on the "AB109" program, and had completed outpatient services. He was trying to stay sober and out of trouble; he wanted to get himself together before trying to have a relationship with mother and wanted to be involved with the baby. Both Christopher and mother agreed to voluntarily drug test.

A non-custody dependency petition was filed on the baby's behalf in a separate proceeding. In a January 31, 2013 report, the social worker cautioned that while the baby was allowed to remain with mother, mother was still in the process of making the necessary changes in her life to remain sober and noted that while the parents denied being in a relationship, mother maintained regular contact with Christopher. On February 4, 2013, mother told the social worker in the baby's case that she was not involved in a relationship with Christopher and she was "attempting to remain completely separate from him." Christopher also told the social worker his focus was "to remain clean and sober," not on a relationship with mother.

An initial/detention hearing was held in the baby's case on February 21, 2013. The court did not detain the baby from mother. On March 28, 2013, a social worker contacted the parents to discuss the initial case plan for the baby. Christopher told the social worker "he and [mother] have beds for all of the girls if they were to obtain services." Christopher asked if he could live with mother. The social worker replied that

8.

would be the court's decision. Mother told the social worker she planned to rent a house from Christopher's parents in Taft. When asked if she wanted to live with Christopher, mother responded that "it would be nice to have her family back together again, but she was willing to submit to what the court wants in order for her to have her children again. Since January 17, 2013, mother had submitted four random drug tests, which were all negative. Christopher's drug tests were also negative. Mother continued to visit the children; a social worker described the visits as "good."

On April 2, 2013, mother told a social worker that she moved from her inpatient substance abuse treatment facility on April 1, and she was given a certificate of completion for 231 days of substance abuse counseling. Mother was living with the baby in a two bedroom home in Taft. She would begin substance abuse counseling on April 5. When asked if she was prepared to have the children returned to her care if her petition were granted, she reported that she had bedding for the children and "what they need" to go and live with her. Mother said she had a support system of "family and friends" to assist with caring for the children, as she was living alone with the baby. The social worker asked mother to provide the names and "vital stats" of people who would likely care for the children. She could not provide names then, but said she would. Mother said that while she maintains regular contact with Christopher, he was not living with her and she was not in a relationship with him.

On April 8, 2013, social workers visited mother and the baby in their home. The home was clean and fully furnished, with no obvious health or safety concerns. The baby was well-groomed and appeared to be in good health. Mother was attending substance abuse counseling three times per week. On the advice of her lawyer, mother was limiting contact between the baby and Christopher to supervised visits with the children.

On April 10, another social worker conducted an unannounced assessment of the home after a visit with the children. Christopher showed the social worker all the "work" he had done on the house; he had redone the walls, kitchen, cabinets, bathroom and both

bedrooms. He stayed up until 2:00 a.m. putting the toddler beds together, as well as the crib and bassinette. He fixed the outlets and walls in the living area, and painted the house. There was a nice leather couch and flat screen TV in the living area, which mother said Christopher bought her. The social worker noticed a pile of men's clothes in the closet in mother's bedroom, as well as two or three pairs of men's shoes on a rack. Christopher emphasized how much work he had put into preparing the house for mother. In the backyard was a shed, boat trailer and an ATV; mother said the trailer and ATV belonged to Christopher. When asked if he stayed at the house, Christopher was adamant that he lived at his father's house.

In an April 23, 2013 telephone conversation with the social worker, mother said she was living alone with the baby. She continued to attend substance abuse outpatient classes three times per week and took the baby with her to class. Mother had given another social worker names of potential babysitters. Two were unacceptable, due to their background checks, but the third, Christopher's grandmother, was appropriate.

On April 25, 2013, two social workers contacted mother at her substance abuse counseling facility due to concerns that Christopher was living in the home. Mother denied he was living there. When asked about the men's clothes in the closet, mother said Christopher lived there before she moved in and left some clothing behind. Mother confirmed she did not plan to continue or maintain a relationship with Christopher. While mother said they have a common bond due to their children, she did not wish to do anything that would put the baby at risk of being removed. She had never been told specifically by a social worker that Christopher could not live with her. The social worker acknowledged there was no court order barring him from living with them, but advised it would be prudent to limit his contact with the baby to supervised visitation due to the lack of proof of his long term sobriety. According to mother, Christopher had completed inpatient substance abuse counseling, was attending outpatient counseling, and

10.

was willing to drug test for the Department. The social worker pointed out that Christopher was not receiving services as to the baby.

Mother explained she moved into the rental home, which is owned by the paternal grandparents, because she thought the court would view being in a home of her own as more appropriate than her other choice of living in a homeless shelter. Father repaired the home because it had been damaged by the prior renter and mother could not repair it on her own.

On May 16, 2013, a social worker and a human services aide went to mother's home to assess it. When they went to the back of the house, they saw a sports utility vehicle parked facing the alley with the driver's door and back hatch open. Christopher, wearing only boxer shorts, was walking hurriedly across the yard and into the house's back door. A small mobile home or fifth wheel trailer was in the yard; its door was open and the social worker saw what appeared to be a cot inside. The social workers knocked on the house's back door and called out to Christopher. After a few minutes, he opened the door and walked out with a towel wrapped around his waist. Christopher said mother was not home and refused to allow the social workers to look inside the home, telling them they needed to call mother. Christopher refused the social worker's request to drug test, saying he was late for work. Christopher denied staying in the mobile home and claimed the things inside belonged to his father. He got clothes from inside the mobile home and got dressed. The social worker and aide left.

Mother called the social worker later that day. She said Christopher was at the home to "fix a faucet." She did not know why he was wearing only his boxer shorts, as he arrived after she left the house to take the baby to a doctor's appointment. Mother said she was trying to comply with the court's orders regarding Christopher's contact with the baby. The social worker explained that while there were no restrictions on Christopher's contact with the baby, it was different when it came to the children, as there were court orders restricting him from unauthorized contact and it did not appear that mother would

11.

enforce any restrictions due to Christopher's presence in the home. Mother sounded surprised and "a little upset" when told that Christopher refused to drug test.

Mother had been drug testing in the baby's dependency case since the baby's birth; all of the tests were negative. Christopher also agreed to submit to random drug tests on at least a monthly basis. His tests in January, February and March were all negative. He failed to test on April 30 and May 7. The parents continued to visit the children regularly. The children were doing well in their foster homes.

The Department recommended the court deny the section 388 petition and terminate parental rights. The social worker explained that, while mother continued to make progress, she also continued to ignore the Department's recommendations concerning Christopher, who appeared to be living in the home and recently refused to drug test. The social worker reasoned it was not in the children's best interest to offer mother family reunification or maintenance services, as the children were bonded with their caretakers, who were committed to adopting them.

*The Combined Section 388 and Permanency Planning Hearing*

At the May 21 hearing, the juvenile court first considered the Department's request to detain the baby from mother and, after argument of counsel, ordered the baby detained. The court then turned to the children's case. Mother testified that she had been in substance abuse counseling as an inpatient from July 2012 to April 1, 2013, and had completed the program. Thereafter, she moved into the house in Taft. She had continued her counseling on an outpatient basis. When leaving residential treatment, she was told that she should be attending self-help support groups for a month or two on a weekly basis. The program available to her in Taft, however, was a six month program that initially required attendance three times per week, which would be reduced to once a week as the program progressed. She had been participating in the Taft program for about two months and expected to complete it in September. Since her entry into the

inpatient program in July 2012, all of her drug tests had been clean and she had not missed one.

Mother had completed two parenting programs – one in June 2012 and the other during her inpatient treatment program. She visited the children regularly and missed only two visits – one due to her hospitalization and the other due to a mix-up when she moved to Taft. Mother described the visits – the children are excited to see her when she first arrives, they usually climb all over her and interact with her, and when she has to redirect the children, they respond to her direction. The twins call her "mommy" and know who she is. When the visits end, sometimes the children do not want to go, but other times, "they are all right with it." Mother testified the twins' foster parent appears to take good care of them and, based on mother's observation, the twins' interaction with the foster parent is not any different than their interaction with her. Mother did not see the twins acting any differently during visits than they did when they lived with her. She believed she still had a parent/child relationship with the twins, and believed she could establish such a bond with Hailey, who was happy to see her during visits.

Mother was aware Christopher's contact with the children was restricted, but she was not aware of any court order restricting his contact with the baby, although she knew the social workers did not want him around the baby. Mother denied that he lived with her, spent the night at the home, or provided unsupervised care for the baby. Christopher's primary purpose for being at her home was to help with things around the house; mother said "he has supported me." He helped her with the deposit for the house, and in her classes and recovery. He worked on the house, not so he could live there, but "[f]or his children." He had done quite a bit of work around the house and purchased some furnishings, but did not assert a right to be in the home as a result of his work.

Since the baby was detained due to Christopher's presence in the home, mother had taken steps to assure he would not be there in the future. A family law office was going to help her file paperwork to obtain a restraining order so, if he did not respect her

13.

wishes, she could do something about it and take legal action. She had made arrangements for child care should the children be placed with her; Christopher's grandmother, who the Department had screened and approved, agreed to sit for her.

Christopher had also completed residential treatment and enrolled in outpatient substance abuse counseling. Mother knew he had been testing for the Department since the baby's initial hearing. She was told the day before the baby was detained that he refused to test, which surprised her. During her contacts with Christopher, he did not appear to her to be using, and she had not seen any traits to indicate drug use. She thought he was clean.

Mother was not having any difficulty maintaining her sobriety. Mother admitted she relapsed after completing substance abuse counseling when the twins were born. Things were different now, however, because she "want[ed] this more than anything," she contacts her sponsor daily, she stays in contact with her support groups such as her "NA" meetings and people at the program, and she does not have the desire to use today. She just wanted to better herself and be the mother her children deserved. Christopher was not at the hearing. Christopher told mother he would no longer come around because he did not want to ruin things for her, as she was doing everything she was supposed to do "to get my babies out of the system."

Although Christopher is the twins' father, mother said she was not in a relationship with him before the twins' birth. Their romantic relationship began when the twins were about 13 months old. Mother admitted being involved in a domestic violence incident with Christopher and knew he had been attending domestic violence counseling, but she did not know the status of counseling.

Mother, who was 24 years old, started using methamphetamine when she was 16. The longest she had been clean was the past year. She voluntarily entered treatment before the twins were born and was able to stay clean for nine months. Mother denied having difficulty staying clean outside of a controlled environment. When asked if she

14.

tended to relapse when associating with Christopher, mother responded "[a]nyone who is not a good influence on me has caused me to relapse in the past, yes."

The home she was renting was the same one she lived in with Christopher at the outset of the case. His parents own the home and she pays them rent with the financial aid she is receiving. Mother said Christopher had shown up at the house uninvited a couple of times, but he listens when she asks him to leave. Mother again denied being in a romantic relationship with Christopher. Christopher pays for mother's cell phone and calls mother on that phone.

After hearing argument of counsel, the juvenile court denied the section 388 petition, as it could not find changed circumstances. The court explained that mother was still in recovery and in transition, which invoked the concept of a changing set of circumstances, and had only been on her own for 45 days, and Christopher's presence was detrimental to mother. The court found the children were likely to be adopted, terminated mother's and Christopher's parental rights, and ordered adoption as the permanent plan.

## DISCUSSION

Mother contends the juvenile court abused its discretion by denying her modification request. Any party to a dependency proceeding may petition the court to modify or set aside a prior order on the grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The party must also show the proposed change would promote the child's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) Whether the juvenile court should modify a previously made order rests within its discretion and its determination may not be disturbed unless there has been a clear abuse of discretion. (*Id.* at p. 318.) The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. (*Ibid.*) All conflicts in the record must be resolved in favor of the juvenile court's decision and all legitimate inferences indulged in to uphold that decision. (*In re Jason L.* (1990) 222 Cal.App.3d

1206, 1214.)  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. (*Stephanie M., supra,* 7 Cal.4th at pp. 318-319.)

The procedure under section 388 accommodates the possibility that circumstances may change so as to justify a change in a prior order.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)  Here, mother sought to set aside the court's August 2012 orders denying her reunification services and continuing the children's out-of-home placement. She contends her circumstances had genuinely changed since then, as she completed inpatient treatment, her drug tests were all clean, she remained in recovery and was participating in NA meetings as well as substance abuse outpatient classes, she had her own home, and she continued visiting the children.  In mother's estimation, this proof, coupled with the bond mother had maintained or developed with the children through regular and affectionate visits between her and the children, warranted an order either providing her with reunification services or returning the children's custody to her. Having reviewed the record as summarized above, we conclude the court properly exercised its discretion by denying mother's petition.

First, the juvenile court reasonably concluded that mother failed to demonstrate a genuine change in circumstances.  She had a longstanding drug problem which she had difficulty overcoming.  She had completed the same drug treatment program in the past only to relapse within nine months.  Her drug use continued even after the children were removed in this proceeding.  While she entered inpatient treatment within four months of the children's removal and, by the time of the permanency planning hearing had remained clean for nearly a year, she achieved sobriety in highly-structured environments.  She had been released from the inpatient program only 45 days before the hearing.  Although mother was staying clean, she had identified both Christopher and the environment in Taft as triggers to relapse.  Despite this, she chose to expose herself to those triggers by maintaining a relationship with Christopher and moving back to Taft.

16.

Without dismissing or diminishing mother's accomplishments, her sobriety outside the confines of a structured setting was nonetheless insufficient to demonstrate she had made sufficient inroads into her persistent substance abuse problem that returning the children to her or resuming reunification services would be appropriate. (See, e.g. *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [parents with extensive drug use history did not show changed circumstances where rehabilitation efforts were only three months old at time of section 366.26 hearing]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months' sobriety does not constitute changed circumstance where parent has history of periods of sobriety and relapses]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 (*Kimberly F.*) ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].) At most, mother showed her circumstances were changing. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 49.) The juvenile court did not abuse its discretion in finding mother failed to show a genuine change in circumstances that would merit considering resuming reunification services or placing the children with her.

Even assuming mother showed changed circumstances, she did not establish reopening reunification services or returning the children to her care would be in their best interests. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 48.) Mother recognizes it is an "uphill battle" to demonstrate that reunification would benefit the children since they had been out of her custody for approximately 14 months. Nevertheless, she argues she shares a bond with the children that is worthy of preservation and by permitting reunification, the children would be able to maintain their sibling relationships.

To understand the element of best interests in the context of a section 388 motion brought, as in this case, shortly before and during the section 366.26 hearing, we look to the Supreme Court's decision in *Stephanie M.* At this point in the proceedings, a parent's interest in the care, custody, and companionship of his or her children is no longer paramount. Rather, once reunification efforts end, the focus shifts to the children's needs

17.

for permanency and stability; there is in fact a rebuttable presumption that continued out-of-home care is in the best interests of the child. (*Stephanie M., supra,* 7 Cal.4th at p. 317.) A court conducting a modification hearing at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child. (*Ibid.*)

Notably, both here and in the juvenile court, mother ignores the children's needs for permanence and stability in advocating her position. Neither the juvenile court nor this court, however, may do so. Mother fails to show how her children's best interests would be served by giving her additional reunification services or returning the children to her custody. Mother continued to make choices that jeopardized her sobriety. The children's current care providers, not mother, acted as their parental figures. There is insufficient evidence that immediate placement of the children with mother or the delay in permanency planning that would result if she were provided reunification services would be in the children's best interests. Under these circumstances, mother's showing did not compel the juvenile court to find return of custody or reinstatement of services would promote the children's best interests. Therefore, under *Stephanie M.*, *supra*, 7 Cal.4th at p. 317, we conclude the juvenile court did not err.

## DISPOSITION

The juvenile court's orders denying mother's section 388 petition and terminating parental rights are affirmed.